IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | CRIMINAL NO. 14-158 |
| | ) | |
| ZUNED SUNESRA | ) | |
| | ) | |

**RESPONSE TO MOTION FOR REVOKATION OF DETENTION ORDER**

AND NOW, comes the United States of America, by and through David J. Hickton, United States Attorney for the Western District of Pennsylvania, and Eric S. Rosen and Conor Lamb, Assistant United States Attorneys for said district, and respectfully files this response to Defendant's appeal of Chief Magistrate Judge Kelly's order of detention pending trial.

**A.    INTRODUCTION**

1.    Prior to his November 20, 2014 detention hearing, Defendant filed a motion for release on bond (Doc. No. 50), to which the Government responded (Doc. 60).  The Government relies on that brief, as it did below, to explicate fully matters pertaining to the weight of the evidence against Defendant.  On November 18, 2014, Defendant filed a reply to the Government's response (Doc. No. 75).

2.    At the commencement of the hearing, pretrial services produced a report that recommended to the Magistrate Judge that Defendant be detained pending trial, as he posed a serious risk

1

of flight.  That recommendation occurred after defendant reported to pretrial services that he had $10 million in personal assets.

3.  The parties then engaged in a lengthy detention hearing.  In addition to proffering the Government's brief, the Government presented the testimony of INS Agent Robert Greiser and Special Agent Neal Bandzak of the Internal Revenue Service.

4.  No decision was made at that hearing; instead, the court held its decision in abeyance pending the submission of proposed surety by Defendant.  The next day, Defendant sent a letter to the Court in which he proposed four properties as surety – three in Florida and one in California.  None of the proposed properties were owned by him; in fact, the properties are owned by Javed Sunesra, a fugitive co-defendant.

5.  The hearing reconvened on November 24, 2014, and prior to the Court issuing its decision, pretrial services again recommended that Defendant be detained.  (Tr. 11/24 at 7).  The Magistrate Judge then carefully and analytically parsed the issues, and ruled that the Government had proven, by a preponderance of the evidence, that Defendant was a serious risk of flight.

6.  Contrary to what Defendant now argues on appeal, the Magistrate Judge found the evidence in this case to be

"significant," and "obviously the result of a long-term very diligent investigation." (Tr. 11/20/14 at 123; Tr. 11/24/14 at 9.)  Any uncertainty expressed by the Magistrate Judge related to legal issues.  (*Id.*) Although the Government does not, respectfully, agree with all of Chief Judge Kelly's factual conclusions, the Government wholeheartedly agrees with her reasoned decision that Defendant presents a "very, very significant risk of flight" (Tr. 11/24/12 at 12), and therefore, must be detained pending trial.  *See United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986) (risk of flight must be proved by preponderance of the evidence, which requires fact finder to believe that the existence of a fact is more probable than its nonexistence).

**B.**     **Defendant presents a serious risk of flight.**

   I.     *Defendant has no ties to the United States, and no incentive to remain in this country pending trial.*

   7.     Defendant gave his first indication that he would not submit to U.S. jurisdiction in a Skype "chat" he engaged in prior to his arrest.  During this Skype chat, which occurred on July 20, 2014, and which was recovered from Defendant's phone after his arrest, Defendant "chats" with a relative of Taimur Khan.  Given that Khan had not been communicating with his family, Defendant was worried that Khan had been arrested upon

his entrance into the United States, was being held by
authorities, and that he was cooperating with the Government:

> Defendant: Any news? [as to what happened with Taimur Khan]
>
> Asmat Khan: nope …
>
> Defendant: when u call his mobile, its off or no. And what
> did he say when u spoke to him
>
> Asmat Khan: his girlfriend just told me she has spoken to
> him and he is fine
>
> Defendant: ok good. Did she say what happen
>
> Asmat Khan: she was just worried about him
>
> Defendant: Why they stopped him?
>
> Asmat Khan: I will give u details in India.
>
> Defendant: O**k is to do with pharma? I have work in Miami
> and will be traveling there that is why I ask?**

8.     Thus, even prior to his arrest, Defendant was aware
that he could be targeted by U.S. law enforcement for "pharma,"
and more importantly, he makes clear that if this was the case,
and had he known about the investigation, he would abort any
trip to Miami.  Defendant was arrested in Miami just a few weeks
later.  This conversation, amongst others, makes clear that
Defendant would, if given the opportunity, flee the United
States rather than remain to face the charges against him.

9.     Indeed, should Defendant be released, the Court need
only look to the actions of Defendant's co-defendants – his
brother and mother.  Both Javed Sunesra (a United States
citizen) and Bismilla Sunesra are fugitives.  They have chosen
to remain in India and not face the charges against them.  The

4

Government has, multiple times, offered these co-defendants safe passage (meaning that they would not be arrested at the border), as well as the opportunity to stay at the hotel of their choosing in Pittsburgh for the trial.  These co-defendants have rejected the Government's pleas, and there is little reason to believe Defendant here would behave differently.

10.  Fear of flight is compounded by the fact that Defendant, unlike his fugitive brother Javed, has absolutely no ties to the United States, let alone the W.D.P.A.  Defendant owns no property in the United States; he has no job that tethers him to the United States; he is not a United States citizen or resident; Defendant has not lived in the United States for years; and, as explained in more detail below, Defendant repeatedly and knowingly flaunted the laws of the United States, even after being told by U.S. law enforcement that his pharma "business" violated the law.  *See United States v. Epstein*, 155 F. Supp. 2d 323 (E.D. Pa. 2001) (detaining businessman who resided in Brazil and was charged with fraud; court ruled that "most significant is [the defendant's] lack of ties to the United States").

11.  The Government is hard-pressed to think of a single reason Defendant would remain in the United States given that, at best, he could return to India and wait out at a lengthy

extradition process, while at worst, he would simply be returned to NEOCC in Ohio to await his trial.  Although Defendant fancies himself an international businessman who must "travel extensively for work," the Government has reviewed Defendant's emails, and it is fairly clear that Defendant's primary "business" was international drug smuggling, and that his other offshoot businesses that did have airs of legitimacy were largely used as vehicles for investing his illegally earned cash.  Further, if convicted in this case, it will be difficult for Defendant to obtain visas for many of the countries to which he used to travel.  Thus, it will not be Defendant's "fugitive status" that would crimp his travel, but rather the fact that he will have on his record multiple felony convictions for drug trafficking, smuggling, fraud and money laundering.

II.     *The Government's case against Defendant is strong, and Defendant faces a lengthy sentence if found guilty.*

12.  Although Magistrate Judge Kelly did state that there was "significant evidence" against Defendant (Tr. 11/20/14 at 123; Tr. 11/24/14 at 9), the Magistrate Judge found "weight of the evidence" to be a "neutral factor" due to her appraisal of the legal, rather than factual, issues (Tr. 11/24/14 at 9)."[1]

---

[1] Defendant claims in his brief that Judge Kelly found that the Government "will face serious impediments to obtaining an actual conviction of Defendant" and that Judge Kelly "noted" that the "weight of the evidence is weak."  Judge Kelly made no such determination, and in fact concluded that this case is "obviously the result of a long-term very diligent investigation." (Tr. 11/20/2014 at 123.)

The Government believes, as set forth in its lengthy opening brief that attached dozens of exhibits showing Defendant's intentional and deliberate criminal conduct, that this factor, contrary to the Magistrate Court's conclusion, strongly weighs in favor of the Government, and is not "neutral."

13.  Buttressing the Government's position is the fact that Taimur Khan, a co-defendant, has already pled guilty to the felony charges against him, and Defendant's co-defendants are refusing to appear in Court, presumably because conviction is likely.  Defendant himself even acknowledged in the Skype chat mentioned above that he could be targeted due to his involvement with "pharma."

14.  The Government is not going to rehash the entirety of its case against Defendant.  However, it is important to make clear that in evaluating Defendant's likelihood of obeying this Court's orders should he be released on bond, the Government has significant evidence that Defendant was repeatedly told that his business violated U.S. law, and yet he continued to operate his illegal business, which provided him and his family with millions of dollars in revenues.

15.  In addition to the dozens of examples listed in the Government's opening brief, on August 18, 2009, Defendant was informed by PharmacyChecker, a third-party online pharmacy

7

validation company, that his membership in the program was being
terminated because his website sold prescription drugs to
customers without requiring a prescription, in clear violation
of U.S. law.  *See* Govt. Ex. A.  In response, Defendant lied to
PharmacyChecker, falsely claiming that "[w]e keep a digital copy
of the prescription for every order for reference."  As set
forth in the indictment, law enforcement has conducted a dozen
controlled purchases, not one of which required a prescription.
Further, searches of all defendants' email accounts clearly
indicate that a prescription was not required.

16.  PharmacyChecker then sent Defendant a report written
by LegitScript, also a third-party validator.  This report, at
pages 6 and 7, catalogued a number of legal requirements that
Defendant's websites failed to meet, amongst them: the
requirement that a pharmacy could sell prescription drugs only
to a patient who has seen a prescribing doctor in person, and
also, that an online pharmacy could only sell drugs that were
FDA-approved, meaning that the drugs needed to come "directly
from a licensed pharmacy in the United States, not one that is
located outside of the United States, even if it has a foreign
pharmacy license."  Defendant, of course, shipped drugs from an
Indian pharmacy into the United States.

17.   Most critically, the report went on, at pages 15 and 16, to examine Defendant's <u>own</u> series of websites, identifying these websites as "rogue pharmacies" that sold drugs without prescriptions.   The report concluded that: "**It is beyond dispute that shopeastwest.com is an illegal rogue pharmacy that does not require a prescription for the sale of prescription drugs**," which are then imported into the U.S. in violation of the law.

18.   In yet another example of Defendant's brazen law-breaking, an American customer of NobleDrugStore ("NDS"), a website run by Defendant, sent an email to "Paul," a pharmacy employee, complaining that his drugs had been seized by U.S. Customs, and that the FDA had sent him letters informing him that the shipment of these drugs into the United States was illegal.   *See* Govt. Ex. B.   The customer attached the FDA letters to his email, and this email, including the attachments, was forwarded to Defendant and later found on his computer.   The FDA letters stated that the prescription medicine mailed to the United States was being refused entry into the United States because it violated the "Food Drug and Cosmetic Act," in that it was "misbrand[ed]" and "unapproved."   In response to these letters that came directly from the U.S. Government, rather than heeding law enforcement, Defendant offered to reship the products to the United States.

19.   As a final example, on April 21, 2013, Katie Dodson, another NDS customer, wrote to NDS stating that her shipment of "domperidone" had been seized by customs because it was "not fda approved."  The customer warned that she needed this medication to "keep my milk supply up or my daughter will end up back in the neonatal intensive care unit."  Domperidone, a drug used to treat gastric illness, is a drug banned in the United States because it can result in sudden death.  This email, like the others, was found in Defendant's computer, and once again, Defendant instructed his employee to "reship the parcel which was detained by customs," thereby demonstrating his willful intent to repeatedly violate the laws of the United States as told to him by customers, third-party validators, and the FDA.

20.   Defendant's knowledge of his illegal activities is important, given that he has been charged with multiple counts of smuggling and conspiracy to smuggle.  The money laundering charge against Defendant also employs smuggling as an underlying specified unlawful activity (SUA).  The key legal element for sustaining a smuggling charge is the defendant's knowledge that the importation of the merchandise into the United States violated the law.  As demonstrated above, this element is easily met by the Government.

10

21.   Unfortunately for Defendant, this criminal activity, which occurred on an industrial level that produced hundreds of thousands of dollars in revenue each month for the Sunesra family, results in a very high Guidelines sentencing range for both the smuggling counts and the money laundering count, each of which carries a 20-year maximum sentence.   As an example, for the money laundering alone - using a very conservative figure of $2.5 million for the amount of money wired from the United States into the foreign bank accounts controlled by Defendant - this results in a base offense level, including enhancements for sophisticated means and promotion of controlled substances, of 36, which translates into a sentence of 188 to 235 months. Facing such a substantial sentence, there is no incentive for Defendant to stay in the United States and await trial.

22.   The arguments Defendant sets forth in his appellate brief regarding the weight of the evidence have little merit and have largely been addressed in the Government's opening brief. Although Defendant maintains that to prove felony misbranding the Government must establish "specific intent to defraud the FDA," this is not the law.   Rather, the law requires the Government to prove a defendant's "intent to defraud and mislead" anyone – consumers, banks, payment processors, customs, and the FDA were all candidates for Defendant's fraud and deception.   Consumers were misled because they were told that

11

the drugs were FDA approved, when they were not.  Banks and payment processors were misled when they were told that Defendant had all the proper licenses to sell drugs in the United States, when they did not.  Entities like PharmacyChecker were misled when Defendant lied and stated that his company kept digital copies of all prescriptions.  And the FDA, as the regulator tasked with safeguarding this nation's drug supply, was repeatedly misled by statements on the Defendant's websites concerning whether their company was following all applicable laws and regulations.

23.    Defendant next asserts that the Government cannot establish a scheme to deprive any person of property.  The Government outlined in detail in its opening brief exactly how Defendant's websites defrauded consumers.  Most notably, Defendant told consumers that all of his products were "FDA-approved," when in fact, none of his products were FDA-approved. Indeed, in an August 12, 2013 email found on Defendant's own computer, "Jerry" from EasternDrugs (another website operated specifically by Defendant) wrote to a customer who had complained about the quality of the drugs provided by EasternDrugs that: "We ship FDA approved GENERIC drugs," and "all of our products are completely legal and approved." *See* Govt Ex. D.  Defendant and his co-conspirators even produced website advertisements which contained the U.S. FDA logo,

12

thereby falsely implying that their products were FDA-approved. *See* Govt. Ex. E.

24.   Simply stated, Defendant's business thrived <u>only</u> because customers were duped into purchasing medicines they thought were approved for sale in the United States.   To the contrary, Defendant sold Indian street drugs that they purchased for pennies on the dollar and which were then off-loaded onto unsuspecting consumers.[2]   Indeed, Defendant's own employee acknowledged in an email to Defendant that he was "basically lying for [Defendant's] company every day." *See* Govt. Ex. F.

25.   Finally, Defendant insists that the act of mailing drugs from India to the United States is not "importation" into the United States, but rather constitutes exporting from India, which, according to him, cannot be regulated by the U.S. Government. The law is to the contrary. *See, e.g., United States v. Chen*, 473 F. Supp. 1042, 1043 (S.D.N.Y. 1979) (the defendants, citizens and residents of Hong Kong, were convicted of importing heroin into the United States after they shipped heroin "to the United States by mail from outside the country").

26.   Indeed, it is now well-settled that conspiracies to import controlled substances into the United States need not

---

[2] Even Defendant's own exhibit introduced at the detention hearing, which showed that Defendant was selling "generic Abilify," demonstrated fraud as generic Abilify does not exist and is certainly not FDA approved.  (Tr. 11/21/ 2014 at 104-06).

even show that an overt act took place within the United States;
rather, it is sufficient if it can be proved that the acts of a
conspiracy were intended to have an impact within the United
States. *See United States v. Freeman*, 660 F.2d 1030, 1034 (5th
Cir. 1981). The seminal case of *United States v. Manuel
Noriega*, 76 F.Supp. 1506, 1515-16 (S.D. Fla. 1990) explains in
detail how the drug importation statute applies not only to
conduct within the United States, but also to conduct outside
the United States that is intended to effect the United States,
which is what Defendant's conduct clearly encompassed here.

27. Thus, the evidence against Defendant is strong, his
expected sentence is lengthy, and as a result, the risk of
flight is high.

III.   *Defendant retains or has access to significant assets
that will aid his flight from the United States.*

28. Incident to his arrest, Defendant told pretrial
services that he had a net worth of approximately $10 million.
In his brief seeking release, Defendant valued his net worth at
$25,000, a sharp decline from his earlier pronouncements. (Doc.
No. 75). At the detention hearing, the Government, to bolster
its contention that Defendant possessed significant resources to
flee, introduced exhibits showing that Defendant recently had
nearly $500,000 in cash in just one of his bank accounts, and
further, that this money came from Defendant's illegal pharmacy

14

network.  *See* (Tr. 11/21/14 at 33-38; 11/24/14 at 3); Govt. Ex.

G.  Additionally, the last financial report produced by Asian

Capital Equities, the pharmacy shell company owned by Defendant,

showed $1.47 million in cash reserves.  *See* Govt. Ex. H.

29.  Thus, not only does Defendant have access to

significant assets, but Defendant has been deceptive about the

availability of significant funds that could aid his flight.

*See, e.g., United States v. Saani*, 557 F.Supp.2d 97, 98-99

(D.D.C. 2008) (detention ordered in tax fraud case: "while this

is not a crime of violence, nor a terrorism or narcotics

offense, it is a crime of deception with direct relevance to

Defendant's ability to support himself overseas.  Defendant's

alleged access to funds in foreign bank accounts, and

Defendant's alleged purposeful and illegal concealment of that

access, is directly relevant to Defendant's flight risk").

30.  Finally, Judge Kelly agreed with the Government

regarding Defendant's access to monies, holding that "based on

the evidence presented to the Court, that this defendant has

significant assets, monetary assets, or has access to them to

potentially facilitate a flight to India, and I believe there is

a very, very significant risk of flight."[3]  *See* 11/24/2014 Tr. at

---

[3] Although the Magistrate Court did question the validity of Defendant's net
worth as stated in the pretrial services report, this report is compiled from
Defendant's own statements to pretrial services.  Further, the Government and
Courts routinely rely on the pretrial services report during bond hearings.

12; *United States v. Goba*, 240 F. Supp. 2d 242, 252 (W.D.N.Y. 2003) (evidence that a defendant has the "ability to maintain themselves abroad for a considerable period of time," constitutes risk of flight by preponderance of the evidence).

31.   Thus, although Defendant now argues that the Government "failed to produce evidence of the Defendant's personal net worth at the Detention hearing," that is simply not true.  In fact, the Government produced the best evidence imaginable: Defendant's own statement.  Defendant offered nothing at the hearing to counter his own statement or the Government's other evidence.  Accordingly, as evidenced by Defendant's ability to post $250,000 in cash as a bond, it is clear that Defendant has access to considerable wealth that could help his flight from the United States.

**C.   Defendant is a danger to the community and he has attempted to obstruct justice.**

32.   Since the November, 2014, detention hearing, the Government has spent considerable time preparing this case for trial.  As pertinent here, the Government has analyzed voluminous data provided by Rackspace in Hong Kong, which hosted the drug distribution websites operated by Defendant.  This data

---

*See, e.g.*, *United States v. Gibson*, 481 F. Supp. 2d 419, 420-21 (W.D. Pa. 2007); *United States v. Zhang*, 2014 WL 5285928, at *3 (E.D. Pa. Oct. 16, 2014); *cf. United States v. Cidraz-Santiago*, 18 F. Supp. 3d 124, 128 (D.P.R. 2014) ("The argument that he no longer owns the vehicles listed in the pretrial services report is so inconsequential that it is hardly worth mentioning.").

shows that Defendant's websites were heavily engaged in the trafficking of controlled substances.

33.  Most notably, Defendants were importing massive quantities of Darvocet and Darvocet-N (Schedule IV narcotics), into the United States from India.  From 2008 to 2012, the websites Superdrugsaver.com and IWantMeds.com sold more than 26,000 orders of Darvocet, supplying customers with more than 2 million pills.  Notably, in 2010, Darvocet had been withdrawn from the U.S. market, but that did not stop Defendant and his conspirators from selling this dangerous controlled substance.

34.  Defendant's websites also sold massive quantities of Soma, a Schedule IV controlled substance.  From 2012 to 2014, Defendant's websites cumulatively sold nearly 1 million pills over more than 10,000 sales.  What this evidence demonstrates is that Defendant, together with his conspirators, operated a long-term criminal enterprise that focused on providing dangerous controlled substances to American consumers.  This is not a case of a single act of bad judgment, but rather the product of nearly 10 years of intentional criminal activity.  *See United States v. Provenzano,* 605 F.2d 85, 95 (3d Cir. 1979) ("[a] defendant's propensity to commit crime generally, even if the resulting harm would not be solely physical, may constitute risk of danger to come within contemplation of" the Bail Reform Act).

17

35.   Additionally, the Bail Reform Act specifically provides for detention where there is a risk that a defendant will obstruct justice, and here, Defendant has been charged by a federal grand jury with obstruction.   A grand jury determined that there was probable cause to believe that Defendant endeavored to influence the judicial proceedings before this Court, in that Defendant's verbal and written statements to a co-defendant constituted an attempt to thwart cooperation against him.

36.   Indeed, in a letter Defendant has admitted to writing (11/21/2014 Tr. at 48), he specifically instructed his co-defendant not to talk about the case or him to anyone; if the co-defendant failed to comply, Defendant threatened to drag the co-defendant's mother into the legal proceedings.   Defendant followed that up with a verbal confrontation with the co-defendant, in which he demanded to know whether the co-defendant was testifying against him.   Although Defendant appears to dwell on the issue of whether the co-defendant himself actually felt physically threatened, obstruction of justice includes all conduct that is designed to influence court proceedings, whether in the form of bribery, threats, or intimidation.   Here, Defendant's threat to go after the co-defendant's mother was an obvious means of attempting to intimidate a co-conspirator into not cooperating with the Government.   *See United States v.*

18

*LaFontaine,* 210 F.3d 125, 134 (2d Cir. 2000) ("obstruction of justice has been a traditional ground for pretrial detention by the courts, even prior to detention for dangerousness which was instituted by the Bail Reform Act of 1982.").

**D.   There are no conditions that could reasonably assure Defendant's appearance**

*I.   Defendant has failed to produce sufficient untainted assets that would ensure his appearance at trial.*

37.  Defendant has proposed surety in the form of four properties – three in Florida, one in California - none of which are owned by him.  Defendant has also offered $250,000 in cash as a bond. Given Defendant's purported net worth of $25,000, this bond will presumably be paid by others, although Defendant does not say by whom.  The use of this property and cash is inappropriate, and the relatively low value of the real property will not ensure Defendant's appearance at trial.

38.  First, the Government filed a brief at Doc. No. 76 setting forth its multi-pronged opposition to the use of the four proposed properties as surety.  In sum and substance, these properties are not owned by Defendant, and Defendant has no legal interest in these properties.  These properties are owned by fugitive Javed Sunesra, who has not come to Court to execute an affidavit agreeing to forfeit these properties should Defendant abscond.  Indeed, despite being given ample time, Defendant has produced no documentation indicating that anyone

who actually has a legal interest in these properties has agreed to forfeit these properties should Defendant flee.

39.   Moreover, all four properties are noticed for forfeiture in the Second Superseding Indictment, and the Government has filed liens on the three Florida properties as they were bought with drug proceeds.  *See* Govt. Ex. I.  Thus, the Florida properties are now encumbered, and therefore ineligible to be utilized as a surety bond by Defendant.

40.   Finally, Defendant proposes to deposit with the Court a $250,000 cash bond.  Defendant has provided no details about where this money will come from, who is depositing it with the Court, and who will agree to forfeit the money.  More importantly, given that, by Defendant's own admission, his family has an aggregate net worth of $10 million, $250,000 is a drop in the bucket, the forfeiture of which will simply be viewed by Defendant's family as a cost of doing business.  *See United States v. Townsend*, 897 F.2d 989, 996 (9th Cir. 1990) ("purpose of bail is not served unless losing the sum would be deeply-felt hurt to the defendant and his family; the hurt must be so severe that defendant will return for trial rather than flee.").

41.   Additionally, as Defendant's drug smuggling was a family affair, and both his brother and his mother have been

indicted along with him, the Government believes that any monies deposited by the Sunesra family are likely to be criminally derived.  Should the Court determine that a secured bond is appropriate here, the Government intends to exercise its right under the Bail Reform Act to a hearing to determine the source of the monies and property designated for forfeiture.  *See* 18 USC 3142(g)(4)("[I]n considering the conditions of release … the judicial officer … <u>shall</u> upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond.").

   II.    *Defendant's proposed pretrial release conditions do not prevent his flight.*

   42.  At the detention hearing, ICE Agent Robert Greiser testified at the detention hearing regarding his experience with foreign nationals who are released on bond.  Agent Greiser testified that even if a passport is confiscated, it is relatively easy for a foreign national to obtain either real or fraudulent travel documents.  (Tr. 11/20/2014 at 12-14). Further, even if the Government is to tell the Indian Embassy not to issue replacement travel documents, India is under no obligation to comply with the U.S. Government's request, and there is nothing "that forces them not to issue a [travel] document."  (Tr. 11/20/2014 at 13).  Other courts have agreed

with the testimony provided by the Agent.  *See United States v. Cohen*, 2010 WL 5387757, at *9 n.11 (N.D. Cal. Dec. 20, 2010) (rejecting offer by defendant to "turn in his passports, to 'renounce' his Israeli citizenship, and have someone 'instruct' the Israeli Embassy to deny new documents or travel authorizations to the defendant, as well as waive extradition;" holding "Defendant offers no authority about the real impact of these offers or whether they are enforceable in Israel if defendant were to flee there.").

43.  Defendant's proposed place of residence – Allentown, Pennsylvania – is also insufficient.  Although the Shahs undoubtedly meant well, they are not appropriate custodians for Defendant.  Defendant has never lived with the Shahs before, he has never visited them in Pennsylvania, and his past interactions with the Shahs seemed to be confined to family visits in India every "one or two years."  (11/21/14 Tr. at 92).  More importantly, both members of the Shahs are absent from their home every day from 5:00 a.m. until 5:00 p.m.  (11/21/14 Tr. at 93, 98-99).  This absence would give Defendant an ample head start if he chose to flee this country.

44.  The Court then considered and rejected Defendant's request for an electronic monitoring bracelet, as an electronic monitoring bracelet would not ensure that he stayed at his

residence, but would, at best, simply alert law enforcement that he had fled.  *United States v. Benevolence Int'l Found.*, 222 F. Supp. 2d 1005, 1007 (N.D. Ill. 2002) (electronic surveillance systems can be circumvented and the monitoring equipment can be rendered inoperative; electronic monitoring does not stop a person from fleeing); *United States v. Orena*, 986 F.2d 628,632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology"); *United States v. Williams*, Crim. A. No. 08-201-4, 2009 WL 1544884, at *2-3 (E.D. Pa. June 2, 2009) (finding that given the nature of the crimes at issue and the severity of the punishment if convicted, electronic monitoring would not ensure appearance).

45.  Finally, although Defendant now raises the prospect of private security providing a round-the-clock monitoring system at a rented apartment, this solution raises profound issues that render it unworkable.[4]  First, given Defendant's lack of assets, he has presented no solution for how this very expensive security will be paid for.  Second, it is apparent that both District and Magistrate courts nationwide are split on the issue of whether the replication of a private prison, which is essentially what Defendant proposes, is even contemplated by the

_____

[4] Although Defendant briefly discussed the issue of hiring private security in his opening brief, this issue was not seriously presented as a viable option to the Magistrate Judge.

Bail Reform Act.  *See, e.g., United States v. Valerio*, 9 F.Supp.3d 283, 292-93 (E.D.N.Y. 2014) (summarizing nationwide case-law regarding the pros and cons of defendants being allowed to buy their way out of prison by hiring security).

46.  But regardless of whether this Court permits a wealthy defendant to pay handsomely for the privilege of replicating a private jail at a Pittsburgh apartment, it is clear that even such an elaborate system of home detention would not ensure Defendant's appearance at trial.  *See Valerio*, 9 F.Supp.3d at 295-97 (reviewing case law and holding that home detention monitored by security guards poses significant costs and burdens on the Government and does not ensure appearance at trial); *United States v. Colorado-Cebado*, 2013 WL 58522621 (W.D. Tex. Oct 30, 2013) (rejecting bid for release to home detention monitored by armed guards, and ruling that "[w]hen an armed guard with license to use that firearm is needed to ensure that a defendant does not flee, then conditions of release are simply not appropriate, regardless of how elaborate a release proposal a wealthy defendant might construct").

**E.**  **<u>Defendant has not been denied due process by his pretrial detention.</u>**

47.  Defendant finally argues that given the complexity of this case and the volume of discovery, pretrial release is mandated as continued detention will violate due process.

48.   The Government notes that Defendant has been fortunate enough to hire three skilled attorneys, none of whom have represented to the Court that they have been unable to view or analyze the discovery provided by the Government.  The Government further believes that all emails provided to defense counsel can be printed or converted to PDF and placed on a DVD. The Government is not aware of other defendants at NEOCC who have been unable to view or look at PDF documents on computers at NEOCC.  Thus, while it would be undoubtedly more convenient for defense counsel to have Defendant close at hand to discuss the case, the ability of Defendant to communicate with his counsel and to contribute to his defense is not so impacted that it has deprived him of the due process of law.

49.   Finally, while the Government is aware that extended periods of incarceration pre-trial can deprive a defendant of due process, *see, e.g., United States v. Accetturo*, 783 F.2d 382 (3d Cir. 1986), given the complexity of this case and the large volume of discovery, this point has not yet been reached.  *See United States v. Zhang*, 2014 WL 5285928 (E.D. Pa. Oct. 16, 2014) (two-year pretrial detention did not violate due process where the case against the defendant was complex and involved large volume of discovery); *United States v. Bianchi*, 2006 WL 2338285 (E.D. Pa. Aug. 10, 2006) (approximately 15-months of pretrial detention did not violate due process given complexity of case

and need to obtain foreign evidence); *see also United States v. Ali*, 534 Fed. Appx. 1 (DC Cir. 2013) (two-year pretrial detention did not violate due process); *United States v. Briggs*, 697 F.3d 98 (2d Cir. 2012) (26-months of pretrial detention did not violate due process).  Indeed, Defendant has been incarcerated for five months, with the Government, at best, responsible for delay only after November 1, 2014.[5]  Accordingly, while the issue of due process can potentially be raised at a later date, given the complexity of the case and the large volume of discovery, now is simply not the time.

50.   In sum, for the reasons set forth above, Defendant's motion for revocation of the order of detention should be denied.

---

[5] Even in the period subsequent to November 1, Defendant has approached the Government for a plea agreement, has indicated a likelihood of pleading, and has even asked the Government to "hold off taking further action against Zuned" in order to negotiate a global plea.  Thus, even for the period post-November 1, the Government is not responsible for the entirety of the delay.

Respectfully submitted,

DAVID J. HICKTON
United States Attorney


s/Eric S. Rosen
Eric S. Rosen
Assistant U.S. Attorney
eric.rosen@usdoj.gov
NY ID No. 4412326


s/Conor J. Lamb
Conor J. Lamb
Assistant U.S. Attorney
conor.lamb@usdoj.gov
PA ID No. 304874

U.S. Post Office & Courthouse
Suite 4000
Pittsburgh, PA  15219
(412)644-3500 (Phone)
(412)644-2645 (Fax)